RANDY S. GROSSMAN
United States Attorney
DANIEL D. SHIN
Assistant United States Attorney
California Bar No. 339409
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7609
daniel.shin@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLA CEJA-HERNANDEZ,<br><br>Defendant. | Case No.: 20-CR-2055-AJB<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)** |

## Introduction

Defendant Carla Ceja-Hernandez has filed a motion asking this Court to reduce her sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A), and order her immediate release based on the following extraordinary and compelling reasons: 1) The caregiver of Defendant's minor children has died or become incapacitated and there is no other caregiver for the children, 2) Defendant has suffered abuse while in custody, and 3) Defendant suffers from "medical conditions" that qualify her for early release. The Court should deny the motion for two reasons. First, no "extraordinary and compelling" reasons under § 3582(c)(1)(A) justify the extraordinary relief of a sentence reduction because Defendant has not provided adequate evidence to show she is the only available caretaker for her children, nor has she provided any specific evidence or allegations as to the purported abuse she experienced in custody. Moreover, as to her "medical conditions," Defendant has not provided any evidence or argument of her conditions that would permit early release, but whatever conditions she may have appear to be well maintained within custody. Second,

the 18 U.S.C. § 3553(a) factors counsel against release because Defendant has served only approximately 39% of her 72-month sentence.

## Factual Background

On November 3, 2020, Defendant was convicted of two counts of importation of a controlled substance. This Court sentenced her to 72 months of imprisonment. Defendant has served approximately 24 months of that sentence. She is currently incarcerated at FCI Dublin and is scheduled to be released on September 5, 2025 with projected good time credit.

## I. BOP's response to the COVID-19 pandemic.

The BOP has made COVID-19 vaccines universally available and has offered vaccination and booster shots to every employee and inmate in every BOP institution. As of August 20, 2022, BOP reports that 369,122 total doses of the vaccine have been distributed within its facilities, and 327,718 doses have been administered. Due to the scale of the national government's response to the COVID-19 pandemic, and the logistical feat of BOP's vaccination program, nearly all BOP institutions now report zero or just a handful of active inmate infections. Although the coronavirus has not been eradicated, the overall picture of the BOP is far different than the one seen one year ago. Vaccination information with respect to individual BOP institutions and the agency overall continues to be published in the BOP's Coronavirus Webpage at https://www.bop.gov/coronavirus/ (updated daily).

As a result of universal access to vaccines and overall declining infection rates within BOP institutions and in the community, BOP now assigns three different operational levels (Level 1, Level 2, and Level 3) to its facilities, depending on the facility's COVID-19 medical isolation rate, vaccination rate, and county transmission rate. A Level 1 facility will have minimal modifications to its operations. A Level 2 facility will have moderate modifications to its operations. And a Level 3 facility will have intense modifications to its operations, which generally means it will continue to adhere to the full COVID-19

Pandemic Plan that the BOP previously had in place. Defendant's facility is currently classified as a Level 3 facility.

Regardless of the operational level, however, all facilities will follow certain operational modifications to protect its inmates. For example, inmates who are not fully vaccinated, or had a known or suspected exposure to a case of COVID-19, must still complete a 10-day quarantine when they first enter the BOP. When BOP transfers inmates from one location to another, a 10-day quarantine may still be required, depending on the sending institution's operational level. In addition, vaccinated inmates will continue to be tested for COVID-19 following exposure to the virus or if they develop any symptoms. Finally, all BOP staff and inmates will be required to wear face coverings in indoor environments regardless of the person's vaccination status.

## II. Defendant's conviction and request for sentence reduction.

On June 24, 2020, Defendant entered the United States from Mexico at the Tecate Port of Entry, San Diego, California. Defendant was the driver of a Chevrolet Suburban and was accompanied by three of her children, aged 4, 13, and 15. During pre-primary inspection, a Customs and Border Protection narcotic detection dog alerted to the underside of the vehicle, and the vehicle was sent to secondary inspection. Once in secondary inspection, CBP officers located 98 packages of methamphetamine and 19 packages of heroin in the rear undercarriage of the vehicle. Approximately 48.72 kilograms of methamphetamine and 12.64 kilograms of heroin were seized. After Defendant was arrested, she told law enforcement that she was going to be paid $5,000 to smuggle narcotics into the United States. Defendant said she was recruited by another person and that she had her own vehicle modified to fit the drug compartment. Moreover, Defendant said she crossed drugs for her recruiter on a prior occasion.

On November 3, 2020, Defendant pleaded guilty to two counts of importation of controlled substances. Defendant was ultimately sentenced to 72 months' imprisonment and 5 years' supervised release.

On July 14, 2022, Defendant filed a motion with this Court seeking a sentence reduction on the grounds that the caregiver of her children has died or become incapacitated and that she is the only available caregiver. ECF No. 51, Defense Motion at 4. Moreover, Defendant argues that other extraordinary and compelling reasons include abuse she experienced while in custody as well as having medical conditions that would qualify her for early release. *Id.* at 6.

**Legal Framework**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in extraordinary circumstances, grant a motion to reduce a defendant's sentence. This motion may be brought by the BOP Director or by a defendant directly. Before a defendant may file a motion for sentence reduction, however, she must first request that the BOP file such a motion on her behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in her sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have lapsed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in section 3553(a)" if the Court finds that (1) "extraordinary and compelling reasons warrant such a reduction" and (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

In the most recent Guidelines Manual, the Sentencing Commission issued a policy statement for reductions of sentences under § 3582(c)(1)(A). It provides that a court may reduce a sentence after considering the § 3553(a) factors if it finds that (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the

safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The policy statement includes an application note defining the criteria that qualify as "extraordinary and compelling." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Third, age may qualify if the defendant (1) is at least 65 years old; (2) is experiencing "a serious deterioration in physical or mental health because of the aging process"; and (3) has served at least 10 years or 75% of the sentence, whichever is less. U.S.S.G. § 1B1.13, cmt. n.1(B). Fourth, certain family circumstances may be extraordinary and compelling due to "the death or incapacitation of the caregiver of the defendant's minor child or minor children" or "the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13, cmt. n.1(C). Lastly, in a broad "catch-all" provision, the application note recognizes the possibility that the BOP Director could identify an extraordinary and compelling reason "other than, or in combination with, the reasons described" above. U.S.S.G. § 1B1.13, cmt. n.1(D).

## Discussion

This Court should deny Defendant's motion because she does not identify "extraordinary and compelling reasons" justifying the dramatic relief of a sentence reduction. First, Defendant does not provide evidence showing that she is the only available caretaker for her minor children. Second, Defendant merely provides that she was exposed

to physical and psychological abuse in the prison without providing any evidence or details. And third, Defendant posits that she has medical conditions that would qualify her for early release but does not provide any evidence or argument as to which specific medical conditions would qualify her for release. Defendant also does not satisfy her burden to show that release is warranted under the § 3553(a) factors, including the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.[1] Defendant has served only 39% of her sentence imposed.

## I. Defendant does not meet the threshold requirement of having "extraordinary and compelling reasons" required for relief under the statute.

Under 18 U.S.C. § 3582(c)(1)(A), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement defines "extraordinary and compelling" to include specific categories of medical conditions and other circumstances. U.S.S.G. § 1B1.13, cmt. n.1(A). Yet Defendant offers none of these circumstances in the motion.

### A. After *Aruda*, this Court is not strictly bound by the Sentencing Commission's current policy statement, but it still serves as an important framework for the Court's exercise of discretion.

The Ninth Circuit has held that the policy statement in U.S.S.G. § 1B1.13 is not binding. *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam). Under *Aruda*'s rationale, § 1B1.13 is technically not "applicable" within the meaning of § 3582(c)(1)(A), because it was issued when only the BOP Director could file motions for compassionate release, before the First Step Act opened up the process to inmates. *Id.* at 800–802. *Aruda* did not express qualms about the *substance* of § 1B1.13, however. Nor did the Ninth Circuit question the Sentencing Commission's standing as the resident expert on this subject. See 28 U.S.C. § 994(t) (instructing Commission to "describe what should be

---

[1] Defendant met the statutory exhaustion requirement because she filed this motion after "the lapse of 30 days" from the date of her request to the warden. 18 U.S.C. § 3582(c)(1)(A). Defendant's request is dated May 12, 2022.

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

Far from criticizing the wisdom of the existing policy, *Aruda*'s holding was a product of the Sentencing Commission's inability to update § 1B1.13 due to its current lack of a quorum. *Aruda*, 993 F.3d at 800 n.1 This Court should therefore resist Defendant's invitation to "invent [its] own policies about compassionate release." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (Easterbrook, J.). That would be inconsistent with Congressional design. As the Ninth Circuit and its sister circuits have emphasized, § 1B1.13 continues to "inform a district court's discretion[.]" *Aruda*, 993 F.3d at 802. Because it remains "a working definition of 'extraordinary and compelling reasons[,]' a [court] who strikes off on a different path risks" abusing its discretion. *Gunn*, at 1180.

Accordingly, the Court's analysis of whether an inmate's reasons are truly extraordinary and compelling should begin with the Sentencing Commission's current policy statement. Although the Court is not limited by the policy statement, and has the freedom to consider additional factors, its discretion should still hover close to § 1B1.13. The following reasons explain why.

*First*, the history of § 1B1.13 shows that the Commission drafted the current policy statement to maximize clarity on what "extraordinary and compelling" means. In 2016, it "conducted an in-depth review" of compassionate release, in response to criticism by the Office of Inspector General about BOP's "low approval rates" and inadequate "implementation of its compassionate release program." U.S.S.G. Appx. C, Amend. 799; see *United States v. Brooker*, 976 F.3d 228, 231–32 (2d Cir. 2020) (describing criticism). As part of its searching review, the Commission heard testimony from witnesses and experts about the need to remove the hurdles that limit compassionate release for worthy inmates. U.S.S.G. Appx. C, Amend. 799. In the end, the Commission did precisely that, issuing a new policy that "broadens" the eligibility criteria and "encourages" the BOP Director to initiate motions using the new standard as its guide. *Id.*

Section 1B1.13's goals of expanding compassionate release and crystalizing guidance means the policy statement is well-suited for use after the First Step Act, which similarly sought to "increase[e] the use and transparency of compassionate release." Pub. L. No. 115-391 § 603(b), December 21, 2018. That the Commission "made a direct plea to the BOP" to ramp up compassionate release engenders confidence that its policy was meant to be as clear and comprehensive as possible. *Bryant*, 996 F.3d at 1250.

*Second*, abandoning § 1B1.13 risks reverting federal sentencing back to an era of indeterminate sentencing that was broadly repudiated by the Sentencing Reform Act in 1984. For nearly a century, rehabilitation was the primary objective of sentencing—to that end, district courts exercised "nearly unfettered discretion" to choose a sentence while parole officers had "almost absolute discretion" to decide when an offender should be released. *Mistretta*, 488 U.S. at 363–65. The system was ultimately discarded because it produced two "unjustified" and "shameful" consequences. *Id.* at 366 (quoting S. Rep. No. 98-225 at 38 and 65 (1983)). The first was "the great variation among sentences imposed by different judges upon similarly situated offenders." *Id.* The second was that nobody could be certain "as to the time the offender would spend in prison." *Id.* "Each was a serious impediment to an evenhanded and effective operation of the criminal justice system." *Id.* These outcomes were also viewed as contributing to growing prison unrest and unjustifiably lenient treatment of serious offenders during a period of rising crime. K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 30–31 (1998).

Against this backdrop, Congress passed the Sentencing Reform Act to abolish the parole system, create the Sentencing Commission, and generally "channel[] judges' discretion" in matters relating to sentencing. *Tapia v. United States*, 564 U.S. 319, 325 (2011). In so doing, Congress aspired to "develop a system of sentencing whereby the offender, the victim, and society all know the prison release date at the time of the initial sentencing by the court, subject to minor adjustments based on prison behavior called 'good time.'" S. Rep. No. 98-225 at 46 (1983). It sought nothing less than to create a "fair" system

for both offenders and the public, to "retain the confidence of American society," and to ensure "an effective deterrent against crime." *Id.* at 49–50.

The Court's discretion should account for this history—not least because the Sentencing Reform Act enacted the modern compassionate release statute in 18 U.S.C. § 3582(c)(1)(A). Pub. L. No. 98-473, October 12, 1984. Compassionate release was not meant to preserve parole, nor was the First Step Act passed to resuscitate it. Because § 1B1.13 continues to be an appropriate framework for determining release eligibility, the Court should "channel" its discretion through it. Otherwise, compassionate release "would return us to the pre-SRA world of disparity and uncertainty." *Bryant*, 996 F.3d at 1257.

*Third*, while it is apparent that Congress in the First Step Act endeavored to release some deserving prisoners serving long sentences,[2] compassionate release was not the solution it chose. Instead, Congress devised a calibrated and cautious, not wholesale, approach. The Act directed the BOP to develop an intricate "risk and needs assessment system" that assigns prisoners to "evidence-based recidivism reduction programming" or other "productive activities," with the goal of lowering their recidivism rating. P.L. No. 115-391 § 101; see 18 U.S.C. § 3632. Under this system, prisoners receive rewards for successful participation in these programs, the most prominent of which is the receipt of time credits that—on top of "good time" credits under § 3624(b)—grant successful prisoners even earlier release from incarceration, to some form of "prerelease custody" or straight to supervised release. P.L. No. 115-391 §§ 101–102; see 18 U.S.C. §§ 3632 and 3624.

The bill's main sponsors confirm that the new BOP system was a centerpiece of Congress' plan to incrementally reduce the U.S. prison population—but early release had to be *earned*. See 164 CONG. REC. S7744 (statement of Sen. Durbin) ("We spell out exactly what we are looking for: the most effective and efficient, evidence-based recidivism-reduction programs. . . . You are either going to do this in good faith, positively, without any violations of your responsibilities as a Federal prisoner—we will give you a chance for less time but no nonsense"); 164 CONG. REC. S7642 (statement of Sen. Cornyn)

---

[2] See 164 CONG. REC. S7737–7822 (December 18, 2018) and H10346–10366 (December 20, 2018).

("The goal of this bill is not to release broad swaths of criminals—in fact, it is just the opposite. This legislation allows prisons to help criminals transform their lives, if they are willing to take the steps and responsibility to do so"). Because Congress carefully crafted this system, the Court should be skeptical about claims allowing prisoners to skip over it.

*Fourth*, hewing close to the existing policy statement is the soundest way to bridge the gap until the Guidelines Manual is updated. Resort to § 1B1.13 has proved appropriate during the coronavirus pandemic. Applying its criteria, judges in this district have properly released scores of prisoners vulnerable to COVID-19 illness, while appropriately denying release to many others who are not as vulnerable. For a motion that does not assert any grounds covered by the policy statement, this Court retains "full discretion" to decide that it simply does not rise to such a "rare" occasion that it would meet the exacting bar established by Congress in § 3582(c)(1)(A). *Jones*, 980 F.3d at 1109; *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring). After all, "extraordinary" means "*exceptional* to a very marked extent," and "compelling" means "to cause to do or occur by *overwhelming* pressure." Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (emphases added). "Put another way, the district court must find that the defendant's situation constitutes the type of 'extreme hardship' that the compassionate-release statute is designed to ameliorate." *United States v. Saccoccia*, 10 F.4th 1, 4 (1st Cir. 2021). Few cases actually meet this standard.

*Fifth*, finality is "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989). While the principle of finality must give way when truly "extraordinary and compelling" cases arise, unguided releases threaten finality in ways that are harmful to society and the offender. Society's goal of deterring crime "depends upon the expectation that one violating the law will swiftly and *certainly* become subject to punishment[.]" *Engle v. Isaac*, 456 U.S. 107, 127 n.32 (1982) (emphasis added; internal quotations omitted). Rehabilitation "demands that the convicted defendant realize that he is justly subject to sanction[.]" *Id* (internal quotations omitted). Opening compassionate release to any reason shifts the offender's focus away from serving just punishment, and

towards the myriad possibilities for how he or she can avoid that service. For this reason as well, the Court's discretion should lean on the factors in § 1B1.13.

*Sixth*, the plurality of federal circuits—including those that recognize § 1B1.13 is *not* binding—have drawn clear boundaries around the reasons that qualify inmates for compassionate release. The Third, Sixth, Seventh, and Eighth Circuits have held that non-retroactive changes in the First Step Act, whether singularly *or in combination with other reasons*, cannot serve as a basis for release because that would undermine Congress's clear effort to limit the retroactivity of the FSA's reforms. *United States v. Andrews*, 12 F.4th 255, 261 (3d Cir. 2021); *United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021); *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021); *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022). These authorities speak with one voice: inmates who received longer mandatory sentences before the FSA may not reduce their sentences on the ground that the Act now requires shorter mandatory sentences for defendants sentenced today.

*Finally*, defendants sentenced after the FSA, but before the Ninth Circuit's decision in *United States v. Lopez*, 998 F.3d 431, 444 (9th Cir. 2021) (interpreting safety valve factors in 18 U.S.C. § 3553(f)(1) as conjunctive requirements), are not eligible based on the *Lopez* decision, either. Assuming *Lopez* remains good law down the line,[3] inmates sentenced prior to *Lopez* under a disjunctive reading of the safety valve framework may claim they were sentenced under an erroneous application of the statute. But "a claim of errors in the original sentencing is not itself an extraordinary and compelling reason for release[.]" *United States v. Martin*, 21 F.4th 944, 946 (7th Cir. 2021). Other specific federal statutes already offer relief for sentencing errors—including the appeals statute in 18 U.S.C. § 3742 and the habeas statute in 28 U.S.C. § 2255. As the Sixth and Seventh Circuits have recognized, the general compassionate release statute may not be construed to circumvent specific, existing statutes. *United States v. Hunter*, 12 F.4th 555, 567 (6th Cir. 2021) (Congress did not "intend[] to allow prisoners to avoid the specific habeas restrictions by resorting to compassionate release"); *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir.

---

[3] The United States has petitioned the Ninth Circuit to grant *en banc* review of the *Lopez* decision.

2021) (compassionate release should not be read to "create[] tension with the principal path and conditions Congress established for federal prisoners to challenge their sentences"). "If the sentencing court mistakenly [sentenced the defendant], then [his] recourse was to pursue a direct appeal or a motion for post-conviction relief under 28 U.S.C. § 2255." *Crandall*, 25 F.4th at 586. A defendant "cannot avoid the restrictions of the post-conviction relief statute by resorting to a request for compassionate release instead." *Id.* Because the "duration of a lawfully imposed sentence does not create an extraordinary or compelling circumstance," *Andrews*, 12 F.4th at 260–61, to the extent a defendant was lawfully but erroneously sentenced under *Lopez*, § 3582(c)(1)(A) does not provide the relief she desires.

        B.     **Defendant does not have the "extraordinary and compelling reasons" required by 18 U.S.C. § 3582(c)(1)(A).**

<u>Family Circumstances</u>

The Sentencing Commission's policy statement defines "extraordinary and compelling" to include two categories of family circumstances. Although these categories are not binding, the Court should give serious weight to them because the Commission utilized its expertise to identify these categories as the only appropriate grounds for compassionate release when a defendant experiences grievous family setbacks:

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

U.S.S.G. § 1B1.13, cmt. n.1(C).

Here, Defendant argues that she is the only available caretaker for her minor children, including one child who appears to be very ill. Unfortunately, however, Defendant's request comes without evidentiary support to show that she would be the only available caregiver for her minor children. First, it is unclear who has been supporting the minor children for the approximately two years that she has been in custody. It is unclear how these minor children would have been surviving without the monetary support of some other adult(s).

Furthermore, Defendant told the Probation Department in her Presentence Investigation Report that her mother, Olivia, took care of the majority of Defendant's children, albeit Olivia had stress about caring for the children. ECF No. 41, PSR, at ¶ 42. Olivia also mentioned that she shares a good relationship with Defendant and that Defendant could reside with her in Tecate, Mexico, after Defendant's release. *Id.* at ¶ 55. However, it does not appear Defendant has mentioned her mother in her motion and whether her mother remains an option as a caregiver for the children.

Accordingly, the United States opposes Defendant's request on this ground because Defendant has not provided sufficient information to support her claim that she is the only available caretaker for her children.

### Purported Abuse in Custody

Defendant argues that the physical and psychological abuse she was exposed to while in custody at Dublin FCI is an extraordinary and compelling reason justifying early release. However, Defendant does not provide any specific information about the purported abuses she has personally experienced. Accordingly, the request for early release based on this ground should also be denied.

### Health Conditions

Courts routinely recognize that even despite the threat from COVID-19, "compassionate release is 'rare' and 'extraordinary;' [and] the current national emergency does not change this." *United States v. Arceo*, No. 9CR616, 2020 WL 2614873 at *2 (N.D. Cal. May 22, 2020); see *United States v. Smeltzer*, No. 18CR4562-JAH, 2020 WL 2797493 at *1 (S.D. Cal. May 29, 2020) ("18 U.S.C. § 3582(c)(1)(A) sets forth a rare exception to the general rule" that courts may not modify final sentence).

Defendant cannot meet the high bar of demonstrating she has extraordinary and compelling reasons. No evidence presented shows that Defendant has "a serious physical or medical condition" that "substantially diminishes" her ability to "provide self-care within the environment of a correctional facility and from which she . . . is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). Because COVID-19 vaccine access is available to every

inmate in the BOP, Defendant's risk is mitigated by that alone. See, e.g., *United States v. Davis*, No. 19-949, 2021 WL 1382119 at *2 (D.N.J. April 12, 2021) ("As vaccine access expands to inmates at FDC Philadelphia, the risk that Davis will contract a serious case of COVID-19 continues to decrease"); *United States v. Minnis*, No. 19CR 20182, 2021 WL 1550429 at *4 (S.D. Florida April 19, 2021) ("[g]iven such wide-spread vaccine distribution in Defendant's facility . . . early release is no longer the correct answer").

Defendant states that she has "medical conditions that qualify [her] for early release . . . ." ECF No. 51, Defense Motion, at 6. Defendant also writes, "I have already had COVID-19 while incarcerated here, and it nearly killed me." *Id.* However, Defendant does not specify what her conditions are, and the severity of such conditions. The United States acknowledges that per her BOP medical records, Defendant appears to have a diagnosis for asthma, in addition to other conditions. Yet, Defendant has not provided an argument or evidence as to how her conditions may substantially diminish her ability to provide self-care within the environment of a correctional facility and from which she is not expected to recover. As the movant, the defendant bears the burden to establish that she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). Defendant has not established this burden.

## II. The factors under 18 U.S.C. § 3553(a) do not support release.

In addition, this Court must consider the 18 U.S.C. § 3553(a) factors in deciding whether a reduction in sentence is warranted. 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). They also counsel against release.

Under § 3553(a), among other considerations, a sentence should "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense," as well as "afford adequate deterrence to criminal conduct." Here, Defendant has served only 39% of her 72-month sentence, which was imposed for Defendant's knowing importation of almost 100 pounds of drugs, all the while using her

minor children to deflect attention at the port of entry.  Thus, even assuming Defendant had presented extraordinary and compelling reasons, Defendant's request for early release should be denied on the § 3553(a) factors.

Therefore, the Court should deny Defendant's motion based on the § 3553(a) factors, in addition to the absence of extraordinary and compelling reasons.

## Conclusion

For these reasons, this Court should deny Defendant's motion requesting compassionate release.

DATED: August 22, 2022       Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

*/s/ Daniel D. Shin*
DANIEL D. SHIN
Assistant U.S. Attorney